UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA
TAMPA DIVISION

GEORGE SHRADER,

     Petitioner,

v.                       Case No. 8:22-cv-1587-MSS-NHA

SECRETARY, DEPARTMENT
OF CORRECTIONS,

     Respondent.

_____/

## O R D E R

Shrader filed a petition for a writ of habeas corpus under 28 U.S.C. § 2254 challenging his state court convictions for first-degree murder and aggravated sexual battery. After reviewing the petition (Doc. 1), the response (Doc. 7), the reply (Doc. 9), and the relevant state court record, the Court **DENIES** the petition.

## PROCEDURAL HISTORY

A jury found Shrader guilty of first-degree murder and two counts of aggravated sexual battery, and the trial judge sentenced Shrader to life with the eligibility for parole after twenty-five years for the first-degree murder conviction and life without parole for the two aggravated sexual battery convictions. (Doc. 8-1 at 1168–70) Shrader appealed, and the state appellate court affirmed in a written *en banc* opinion. (Doc. 8-1 at 1277–1333) The state supreme court denied review of the written opinion. (Doc. 8-1 at 1492)

Shrader filed a petition alleging ineffective assistance of appellate counsel (Doc. 8-1 at 1496–1508), and the state appellate court denied relief. (Doc. 8-1 at 1511) Shrader filed a motion for post-conviction relief (Doc. 8-1 at 1513–21), the post-conviction court denied relief (Doc. 8-1 at 1621–28), and the state appellate court affirmed. (Doc. 8-1 at 1902) Shrader's federal petition follows.

## FACTS

The state appellate court's written *en banc* opinion[1] affirming Shrader's convictions and sentences summarized the evidence at trial as follows (Doc. 8-1 at 1278–82):

> The evidence adduced at trial, viewed in the light most favorable to the State, established the following facts: Three decades ago in the early morning hours of January 27, 1986, a law enforcement officer discovered the dead body of a female victim lying in the middle of a dirt road. She had been stabbed thirty-six times and was wearing only a T-shirt. She lay in a pool of her own blood, and her body was still warm to the touch despite it being bitterly cold that morning. The officer noticed that there were signs of a struggle in the area where the victim lay.
>
> Crime scene technicians collected swabs from the victim's vagina and anus as part of a rape kit protocol. They also collected soil samples containing drops of blood leading away from her body. Those drops of blood did not belong to the victim. The investigation went cold. In 2007, a cold case committee consisting of current and former law enforcement officers, representatives of the State Attorney's and Medical Examiner's offices, and the Biology and Forensics Division of Florida's Department of Law Enforcement recommended that the Hillsborough County

---

[1] Nine state appellate court judges concurred in the written *en banc* opinion, three judges concurred with a separate opinion, two judges concurred only in the result, and one judge dissented. (Doc. 8-1 at 1294)

Sheriff's Office re-open the case of the unsolved murder of the victim described above. Three years later, a Florida statewide DNA database yielded a match between the DNA collected from the victim's rape kit and Shrader's DNA.

The State brought Shrader to trial in 2013. During the State's case-in-chief, it presented physical evidence and the testimony of seventeen witnesses. Sergeant Robert King of the Hillsborough County Sheriff's Office testified that he discovered the victim's dead body on the early morning of January 27, 1986. The victim's body lay in the middle of a dirt road in an undeveloped peninsula in Hillsborough County known as Whiskey Stump.

Sergeant King described that morning as "bitterly cold" and the temperature as being in the "high twenties, low thirties." Despite the low temperature, the victim's neck was warm to the touch, and Sergeant King observed steam emanating from the victim's dead body. Moreover, the victim was not dressed for cold weather. She was almost completely nude, save for a yellow T-shirt. In fact, the victim was not dressed in any of the clothing witnesses observed her wearing earlier in the evening, when she was hitching a ride from an establishment known as the Happy Days Lounge to another establishment known as the East Side Lounge.

Sergeant King testified that when he observed the crime scene, he saw "signs of what appeared to be a struggle right there." The State published photographs to the jury of the crime scene and of the victim's slain body. She had been stabbed thirty-two times in the front, side, and back of her body, and she was found lying in a large pool of her own blood, which stained her bare buttocks and thighs. The photographs also displayed four additional wounds — three to her left upper arm and one to her right hand — which the medical examiner testified were defensive in nature. The State presented evidence demonstrating that Shrader's DNA matched not only blood drops leading away from the victim's body, but also semen found inside the victim's vagina and anus.

When cold case investigators Detective Chris Fox and Special Agent James Noblitt interviewed Shrader on January 31, 2011, and February 18, 2011, Shrader denied ever knowing the victim and denied ever having been to Whiskey Stump. And when they showed him a photograph of the victim, Special Agent Noblitt noticed that Shrader immediately looked away without even examining the photo. At the conclusion of their second interview, Special Agent Noblitt invited Shrader to call them if he remembered being with the victim. Despite having repeatedly denied knowing the victim throughout the interview, Shrader responded that he would "meditate and think and see" if he could "figure out what's going on."

The State further presented evidence that Shrader's right hand bore newly acquired cuts to his pinky and ring fingers on January 27, 1986, which was the very same day that Sergeant King had found the victim's body. On that day, Shrader had those cuts sutured at Tampa General Hospital, and when he appeared at the Hillsborough County Courthouse that day to have his fingerprints taken for an unrelated matter, Shrader was unable to give any prints from his right hand because of those recently sutured cuts.

Shrader told a doctor that he received the cuts while working as a roofer. But when one of Shrader's then-roommates inquired as to how he cut his fingers, Shrader told her a different story — that he injured his hand on a nail sticking up from a banister at their apartment. The roommate testified that she had never gotten more than a scratch from the nail in question and that even her children managed to avoid getting injured by the nail on the banister.

When Detective Fox and Special Agent Noblitt asked Shrader in February 2011 about the cuts he received on his right hand back in 1986, Shrader claimed that he cut his hand on a knife while reaching into a dishwasher. But Shrader's roommate from that time would testify that they did not even own a dishwasher and that, at any rate, Shrader never washed dishes. And when the cold case investigators asked Shrader where he received his sutures back on January 27, 1986, Shrader responded: "At the hospital." But when asked which hospital, Shrader

hesitantly claimed that he did not recall. Shrader then changed his story and claimed that he never received sutures at all, before finally answering that he did not remember one way or another.

## STANDARDS OF REVIEW

**AEDPA**

Because Shrader filed his federal petition after the enactment of the Antiterrorism and Effective Death Penalty Act, AEDPA governs his claims. *Lindh v. Murphy*, 521 U.S. 320, 327 (1997). AEDPA amended 28 U.S.C. § 2254(d) to require:

> An application for a writ of habeas corpus on behalf of a person in custody pursuant to the judgment of a State court shall not be granted with respect to any claim that was adjudicated on the merits in State court proceedings unless the adjudication of the claim —
>
> (1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or
>
> (2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.

A decision is "contrary to" clearly established federal law "if the state court arrives at a conclusion opposite to that reached by [the U.S. Supreme Court] on a question of law or if the state court decides a case differently than [the U.S. Supreme Court] has on a set of materially indistinguishable facts." *Williams v. Taylor*, 529 U.S. 362, 413 (2000). A decision involves an unreasonable application of clearly established federal law "if the state court identifies the correct governing legal

principle from [the U.S. Supreme Court's] decisions but unreasonably applies that principle to the facts of the prisoner's case." *Williams*, 529 U.S. at 413. Clearly established federal law refers to a holding of an opinion by the U.S. Supreme Court at the time of the relevant state court decision. *Williams*, 529 U.S. at 412.

"[AEDPA] modified a federal habeas court's role in reviewing state prisoner applications in order to prevent federal habeas 'retrials' and to ensure that state-court convictions are given effect to the extent possible under law." *Bell v. Cone*, 535 U.S. 685, 693 (2002). A federal petitioner must show that the state court's ruling was "so lacking in justification that there was an error well understood and comprehended in existing law beyond any possibility of fairminded disagreement." *Harrington v. Richter*, 562 U.S. 86, 103 (2011).

**Ineffective Assistance of Counsel**

Shrader asserts ineffective assistance of counsel — a difficult claim to sustain. *Strickland v. Washington*, 466 U.S. 668, 687 (1984), requires a defendant to demonstrate both deficient performance and prejudice:

> First, the defendant must show that counsel's performance was deficient. This requires showing that counsel made errors so serious that counsel was not functioning as the "counsel" guaranteed the defendant by the Sixth Amendment. Second, the defendant must show that the deficient performance prejudiced the defense. This requires showing that counsel's errors were so serious as to deprive the defendant of a fair trial, a trial whose result is reliable.

"[T]here is no reason for a court . . . to address both components of the inquiry if the defendant makes an insufficient showing on one." *Strickland*, 466 U.S. at 697.

"[C]ounsel is strongly presumed to have rendered adequate assistance and made all significant decisions in the exercise of reasonable professional judgment." *Strickland*, 466 U.S. at 690. "[A] court deciding an actual ineffectiveness claim must judge the reasonableness of counsel's challenged conduct on the facts of the particular case, viewed as of the time of counsel's conduct." *Strickland*, 466 U.S. at 690.

 "An error by counsel, even if professionally unreasonable, does not warrant setting aside the judgment of a criminal proceeding if the error had no effect on the judgment." *Strickland*, 466 U.S. at 691. To demonstrate prejudice, the defendant must show "a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." *Strickland*, 466 U.S. at 694. A reasonable probability is a "probability sufficient to undermine confidence in the outcome." *Strickland*, 466 U.S. at 694.

*Strickland* cautions that "strategic choices made after thorough investigation of law and facts relevant to plausible options are virtually unchallengeable." *Strickland*, 466 U.S. at 690. A defendant cannot meet his burden by showing that the avenue chosen by counsel was unsuccessful. *White v. Singletary*, 972 F.2d 1218, 1220–21 (11th Cir. 1992).

Because the standards under *Strickland* and AEDPA are both highly deferential, "when the two apply in tandem, review is 'doubly' so." *Richter*, 562 U.S. at 105. "Given the double deference due, it is a 'rare case in which an ineffective assistance of counsel claim that was denied on the merits in state court is found to

merit relief in a federal habeas proceeding.'" *Nance v. Warden, Ga. Diag. Prison*, 922 F.3d 1298, 1303 (11th Cir. 2019) (citation omitted).

**Exhaustion and Procedural Default**

A petitioner must exhaust the remedies available in state court before a federal court can grant relief on habeas. 28 U.S.C. § 2254(b)(1)(A). The petitioner must (1) alert the state court to the federal nature of his claim and (2) give the state court one full opportunity to resolve the federal claim by invoking one complete round of the state's established appellate review process. *O'Sullivan v. Boerckel*, 526 U.S. 838, 845 (1999); *Picard v. Connor*, 404 U.S. 270, 278 (1971). The state court must have the first opportunity to review and correct any alleged violation of a federal right. *Baldwin v. Reese*, 541 U.S. 27, 29 (2004).

A federal court may stay a habeas case to allow a petitioner to return to state court to exhaust a claim. *Rhines v. Weber*, 544 U.S. 269 (2005); *Rose v. Lundy*, 455 U.S. 509 (1982). If the state court would deny the claim on a state procedural ground, the federal court instead denies the claim as procedurally defaulted. *Snowden v. Singletary*, 135 F.3d 732, 736 (11th Cir. 1998) (citing *Coleman v. Thompson*, 501 U.S. 722, 735 n.1 (1991)). Also, a petitioner's failure to comply with a state procedural rule governing the proper presentation of a claim bars review of that claim on federal habeas. *Coleman*, 501 U.S. at 729. "[A] state court's rejection of a federal constitutional claim on procedural grounds will only preclude federal review if the

state procedural ruling rests upon [an] 'independent and adequate' state ground." *Judd v. Haley*, 250 F.3d 1308, 1313 (11th Cir. 2001).

To excuse a procedural default on federal habeas, a petitioner must demonstrate either (1) cause for the default and actual prejudice from the alleged violation of federal law or (2) a miscarriage of justice. *Maples v. Thomas*, 565 U.S. 266, 280 (2012); *House v. Bell*, 547 U.S. 518, 536–37 (2006).

## ANALYSIS

### Ground One, Subclaim A

Shrader asserts that the trial judge violated his federal rights by denying a motion for a mistrial after jurors read a newspaper article about the case. (Doc. 1 at 3, 8–12) Shrader asserts that the trial judge violated his rights under the Fifth, Sixth, and Fourteenth Amendments. (Doc. 1 at 12)

The Respondent argues that Shrader failed to exhaust his remedies for a claim based on a violation of the Fifth and Fourteenth Amendments. (Doc. 7 at 26–27) However, in his brief on appeal, Shrader cited numerous opinions by the United States Supreme Court and by federal circuit courts. (Doc. 8-1 at 1204–10) Consequently, Shrader sufficiently alerted the state appellate court to the federal nature of his claim. *Lucas v. Sec'y, Dep't Corrs.*, 682 F.3d 1342, 1352 (11th Cir. 2012) ("To 'fairly present' a claim, the petitioner is not required to cite 'book and verse on the federal constitution.'") (quoting *Picard*, 404 U.S. at 278).

The state appellate court affirmed the trial judge's denial of the motion for a mistrial as follows (Doc. 8-1 at 1294):

Shrader contends the trial court abused its discretion by denying his motion for mistrial based on his allegation that he was denied a fair trial because the jury had been tainted by certain jurors possibly having been briefly exposed to a newspaper article regarding Shrader. The record demonstrates that the trial court thoroughly investigated this allegation and supports the trial court's factual finding that the jury had not been tainted. Accordingly, we conclude the trial court did not abuse its discretion in denying the motion for mistrial. *See England v. State*, 940 So. 2d 389, 401–02 (Fla. 2006) ("A motion for a mistrial should only be granted when an error is so prejudicial as to vitiate the entire trial." (citing *Snipes v. State*, 733 So. 2d 1000, 1005 (Fla. 1999)).

Whether a trial judge must grant a motion for a mistrial is an issue of state law, and a federal court defers to a state court's determination of state law. *Estelle v. McGuire*, 502 U.S. 62, 67–68 (1991) ("[I]t is not the province of a federal habeas court to reexamine state-court determinations on state-law questions.").

"The Supreme Court has held that a defendant has the right to trial by an impartial jury and that, '[i]n the constitutional sense, trial by jury in a criminal case necessarily implies at the very least that the evidence developed against a defendant shall come from the witness stand in a public courtroom where there is full judicial protection of the defendant's right of confrontation, of cross-examination, and of counsel.'" *Parker v. Head*, 244 F.3d 831, 839 (11th Cir. 2001) (quoting *Turner v. Louisiana*, 379 U.S. 466, 472–73 (1965)).

"To safeguard a defendant's constitutional rights, the exposure of a jury to extrinsic information has been 'deemed presumptively prejudicial.'" *Parker*, 244 F.3d at 839 (quoting *Remmer v. United States*, 347 U.S. 227, 229 (1954)). "To rebut a

presumption of prejudice, the government must show that the jurors' consideration of extrinsic evidence was harmless to the defendant." *Boyd v. Allen*, 592 F.3d 1274, 1305 (11th Cir. 2010). "[A court] consider[s] the totality of the circumstances surrounding the introduction of the extrinsic evidence to the jury, . . . includ[ing]: (1) the nature of the extrinsic evidence; (2) the manner in which the information reached the jury; (3) the factual findings in the trial court and the manner of the court's inquiry into the juror issues; and (4) the strength of the government's case." *Boyd*, 592 F.3d at 1305.

On the morning of the second day of trial, the trial judge informed the parties that the bailiff confiscated from a juror a newspaper that contained an article about the case (Doc. 8-1 at 494–98):

| | |
|---|---|
| [Trial judge:] | Okay. Good morning. I see Mr. Shrader and our counsel are present. Do I understand our jury is present? |
| [Bailiff:] | I think we are missing a few. |
| [Trial judge:] | I am going to raise one issue with you because I believe as soon as anything like this comes to the attention of any of us, and certainly the judge, we put it on the record. |
| | I understand that in this morning's TBT[2], there may have been an article dealing with this case. I have not read nor seen the article myself, but I understand at least one member — is it one? |

_____

[2] The TBT is a free newspaper published by the Tampa Bay Times. (Doc. 8-1 at 500)

[Bailiff:]          I don't know.

[Trial judge:]      I was advised, and you correct me if I'm wrong, that one member of the jury walked in carrying a TBT and that was confiscated.

[Bailiff:]          That was taken on the way in, and when I stepped in, they had it open.

[Trial judge:]      Let's be very specific. Get whoever [ ] it is in here who saw this because I need to know what "they" means. Was it one person, two people, who was it? Ask Deputy Brock to step in.

[Bailiff:]          Do you want me to bring that one juror in?

[Trial judge:]      Not yet. Right now, I'm trying to provide counsel with information about what I understand that I've been advised, and I want to make sure I do that accurately. Ask her to step in if she is the one who observed this.

                    Hi.

[Deputy Brock:]     Hi.

[Trial judge:]      And, Deputy, I want to be accurate in advising the jurors. Do I understand that you observed a member of the jury walk in, carrying in their hand a newspaper called the TBT?

[Deputy Brock:]     Yes, sir.

[Trial judge:]      And you confiscated that?

[Deputy Brock:]     Several.

| | |
|---|---|
| [Trial judge:] | Several, that they had in their hands? |
| [Deputy Brock:] | Yes, sir. |
| [Trial judge:] | When you walked in, did you see one juror or more than one juror with it open to the article? |
| [Deputy Brock:] | They were standing around the table. I'm not sure how many were staring at it, but it was open on the table. |
| [Trial judge:] | All right. Now, that said, I'll hear from counsel. |
| [Prosecutor:] | May I inquire of the deputy? |
| [Trial judge:] | Yes, go ahead. I want to make sure that the facts are out here. |
| [Prosecutor:] | Deputy, can you be clear whether the paper that they were looking at was open to the specific article dealing with this trial or was it open to another page? |
| [Deputy Brock:] | No, there is an article of this trial. The picture is from the trial as well. |
| [Prosecutor:] | Was that what the paper was open to when they were looking at it? |
| [Deputy Brock:] | Yes. |
| [Prosecutor:] | Thank you. |
| [Trial judge:] | All right. |
| [Trial counsel:] | May I? |
| [Trial judge:] | Sure. |
| [Trial counsel:] | How many were looking at it? |

[Deputy Brock:]    Like I said, they were standing around the table. I can't be sure how many were actually looking at it before I got there, but —

[Bailiff:]    I would say there was maybe one or two. One had it open, and they were sitting there, and there was one or two people looking, and as we walked in, we said, did you read this article. They said, no, we just saw it. They said we didn't read it, but we did see it.

[Trial judge:]    Do we have a copy of what it is that they quote "saw"?

[Bailiff:]    I can get you one.[3]

[Prosecutor:]    Can I ask the bailiff, Your Honor, —

[Trial judge:]    — we're going to let you ask questions, but let's wait just a second.

    I'm being handed a copy of the paper now. This, for the record, is commonly handed out for free around the courthouse. All right. I'm looking at it. All right. Let's go ahead. Have you had a chance to see this?

[Trial counsel:]    Not that one. I saw the mainstream paper.

[Trial judge:]    All counsel, take a copy of it. Just a minute, Deputy Brock. We're going to ask any other questions we wish to ask. All right. Now, are all of our jurors back yet?

_____

[3] A copy of the newspaper article is in the appendix filed by the Respondent. (Doc. 8-1 at 488)

14

| | |
|---|---|
| [Bailiff:] | Yes, sir. |
| [Prosecutor:] | Deputy, can you identify specifically what jurors were looking at this article? |
| [Bailiff:] | I would have to look at the list here. |
| [Prosecutor:] | And, Your Honor, for the record, this article is online on their website, too, [ ] and I read it last night. |
| [Trial judge:] | Okay. |
| [Bailiff:] | I believe it would be Karen Childs Smith [who] was [ ] sitting at the table with it open. I don't know who was over her shoulder. I just keyed in on the article. |
| [Deputy Brock:] | There was a group of them standing around. |
| [Bailiff:] | Right. |

During the discussion between the trial judge and the parties, trial counsel identified prejudicial language in the article (Doc. 8-1 at 499–500):

| | |
|---|---|
| [Trial counsel:] | I'm particularly concerned, and let me make this a record, that the cut line of the photograph in the Tampa Bay Times, the little — the free newspaper Your Honor referred to a minute ago, has a cut line that says, convicted of second-degree murder in 1986. |

The prosecutor asked the bailiff additional questions about his observations (Doc. 8-1 at 501):

| | |
|---|---|
| [Prosecutor:] | I just wanted to ask, you all mentioned there [were] people standing around. Did it appear to you that the people |

|                | standing around, the jurors standing around, were they hovering behind this female that was reading or had the paper open in front of her? I just want to be as specific for the record as we can about that. |
|----------------|-----------------------------------------------------------------------------------------------|
| [Bailiff:]     | I would say there was one or two behind them, and there were others on the other side of the table who were kind of looking at the newspaper because she had it open. |
| [Prosecutor:]  | The people behind her, were they looking at the newspaper? |
| [Bailiff:]     | It looks as though they were. |
| [Prosecutor:]  | Did it appear as you entered the room that there [were] any discussions occurring? |
| [Bailiff:]     | No. |

The trial judge and the parties questioned each juror individually about the newspaper article. Juror Ly, Juror O'Brien, and Juror Moore denied reading an article about the case and denied observing any other person in the jury room with a newspaper. (Doc. 8-1 at 509–10, 516–17) Juror Hill and Juror Lucas observed a juror walk into the room with a newspaper but denied observing anyone read it because the bailiff took the newspaper away. (Doc. 8-1 at 503–04, 515) Juror Rodriguez, Juror Nunez, and Juror Cummings observed a newspaper on the table in the jury room but denied observing anyone read it. (Doc. 8-1 at 505–06, 512–14) Juror Stenson observed another juror walk into the room with a newspaper and a bailiff take the newspaper away after instructing the jurors not to read it. (Doc. 8-1 at 520–21) Juror

Phelps heard that a newspaper was found in the jury room, denied hearing any juror comment about the newspaper, and did not observe any juror read the newspaper because the newspaper was confiscated. (Doc. 8-1 at 528–30)

Juror Davis stated that another juror told him not to read the newspaper because the juror saw an article about the case. (Doc. 8-1 at 507–08) Juror Park observed Juror Ward reading a newspaper, looking at a picture of Shrader in the newspaper, and turning the page after commenting, "Oh, there's something in here," and "Don't look at page ten." (Doc. 8-1 at 518–19) Juror Park denied that anyone read or looked at the article about Shrader because the bailiff took the newspaper away. (Doc. 8-1 at 518) Juror Childs Smith saw Juror Ward with a newspaper in the jury room, saw out of the corner of her eye a picture in the newspaper, and observed Juror Ward quickly close the newspaper. (Doc. 8-1 at 523–25) Juror Childs Smith did not remember what the picture depicted, denied reading an article in the newspaper, and stated that Juror Ward was only flipping through the newspaper. (Doc. 8-1 at 523–25)

Juror Ward stated that he brought a newspaper into the jury room. (Doc. 8-1 at 525–26) Juror Ward stated that he observed a picture in the newspaper for about three seconds but denied reading any text around the picture and stated that he turned the page after looking at the picture. (Doc. 8-1 at 526–28) Juror Ward denied that he told the other jurors anything and denied that he saw any other juror look at the newspaper. (Doc. 8-1 at 526–28) At the end of trial, the trial judge discharged Juror Ward as an alternate juror. (Doc. 8-1 at 1025–27)

Each juror denied that he or she had learned any fact that prevented him or her from acting fairly and impartially in the case. (Doc. 8-1 at 503–06, 508–22, 524–25, 527–29)

During further questioning, Deputy Brock stated that, when she entered the jury room, she saw the newspaper open but could not see anything on the page because a juror closed the newspaper. (Doc. 8-1 at 531) The bailiff saw the newspaper open to the page with the article about the case and heard a juror comment that the jurors must not look at the article. (Doc. 8-1 at 531) The bailiff immediately took the newspaper. (Doc. 8-1 at 531) The bailiff thought that Juror Childs Smith and Juror Ward briefly looked at the article and that other jurors may have looked over their shoulders. (Doc. 8-1 at 532) Deputy Brock confiscated two newspapers, and the bailiff confiscated a third newspaper from the table in the jury room. (Doc. 8-1 at 533–34)

The trial judge denied the motion for a mistrial as follows (Doc. 8-1 at 535–36):

> [Trial judge:]     I've listened to what the deputies had to say and what the jurors had to say. Thank you.
>
> The court is going to find that it conducted a thorough inquiry of each of these jurors individually. I've allowed a thorough inquiry of the deputies. The one thing that is clear is, no, there is not evidence that they actually read any reports or other — the evidence suggests that they were in there. There was a paper open

somewhere to a page, at some point
obviously to the page that had this
photo, that apparently they did exactly
what I told them. As soon as he saw the
picture, they stopped.

That is what the evidence indicates,
and the testimony from our deputies
here today, while it says they were in
the area and may have been looking
towards the paper, [it] is not
contradictory to what we've [heard]
from fourteen individuals who came in
and were subjected to full inquiry.

Accordingly, I'll specifically find that
they have not, since the allegation is
that they have been tainted, they have
not been tainted. They have not been
privy to information that is going [to]
render them unable to be fair and
impartial in [the] discharge of their
duties here.

Accordingly, the motion for mistrial is
denied, and we will continue.

Juror Park observed Juror Ward look at the picture of Shrader in the
newspaper, turn the page, and comment, "Don't look at page ten." (Doc. 8-1 at
518–19) Juror Davis heard another juror advise not to read the newspaper because
the juror saw an article about the case. (Doc. 8-1 at 507–08) Juror Childs Smith saw
out of the corner of her eye a picture in the newspaper and observed Juror Ward
quickly close the newspaper. (Doc. 8-1 at 523–25) Juror Ward stated that he saw the
picture in the newspaper for about three seconds, did not read any text around the
picture, and turned the page after looking at the picture. (Doc. 8-1 at 526–28)

Deputy Brock stated that, when she entered the jury room, she saw the newspaper opened to a particular page but did not see what the page depicted because a juror immediately closed the newspaper. (Doc. 8-1 at 531) The bailiff stated that he saw one juror with the newspaper open and a few jurors looking at the article about the case, that he asked the jurors whether they had read the article, and that the jurors responded that they saw the article but did not read it. (Doc. 8-1 at 496–97, 501, 532) The bailiff immediately took the newspaper. (Doc. 8-1 at 531)

The trial judge's determination of facts is presumed correct, and Shrader fails to rebut the determination with clear and convincing evidence. 28 U.S.C. § 2254(e)(1). Because the unrebutted evidence demonstrates that the jurors saw an article about the case but did not read the article and that the jurors did not learn any fact that prevented them from acting fairly and impartially in the case, the state appellate court did not unreasonably deny the claim. *Parker*, 244 F.3d at 839.

Ground One, Subclaim A is **DENIED**.

**Ground One, Subclaim B and Ground Two**

In subclaim B of Ground One, Shrader asserts that the trial judge violated his federal rights by denying his motion for judgment of acquittal. (Doc. 1 at 3) In Ground Two, Shrader further asserts that appellate counsel deficiently performed by failing to federalize the sufficiency of the evidence claim on direct appeal. (Doc. 1 at 13–14)

**Ground One, Subclaim B**

Shrader asserts that the trial judge violated his federal rights by denying his motion for judgment of acquittal. (Doc. 1 at 3) He contends that the prosecutor failed to rebut a reasonable hypothesis of innocence that consensual sex occurred before the victim was killed. (Doc. 1 at 12) He argues that the prosecutor therefore failed to prove felony murder based on a sexual battery. (Doc. 1 at 12)

The Respondent asserts that Shrader failed to fairly present a federal claim to the state court. (Doc. 7 at 31–33) In his brief on direct appeal, Shrader asserted that at trial the prosecutor failed to rebut his reasonable hypothesis of innocence. (Doc. 8-1 at 1211–14) Shrader did not assert that the trial judge violated federal due process, did not cite any federal court opinion or constitutional provision, did label the issue "federal," and cited only state court opinions. (Doc. 8-1 at 1211–14) Because Shrader failed to alert the state appellate court to the federal nature of his claim, Shrader failed to exhaust his remedies in state court. *Kelley v. Sec'y, Dep't Corrs.*, 377 F.3d 1317, 1345 (11th Cir. 2004) ("'[T]he exhaustion doctrine requires a habeas applicant to do more than scatter some makeshift needles in the haystack of the state court record. The ground relied upon must be presented face-up and squarely; the federal question must be plainly defined.'") (citation omitted).

If Shrader returned to state court to raise the federal due process claim, the state post-conviction court would deny the claim as procedurally defaulted. Fla. R. Crim. P. 3.850(c) ("This rule does not authorize relief based on grounds that could have or should have been raised at trial and, if properly preserved, on direct appeal

of the judgment and sentence."). Consequently, the claim is procedurally defaulted

in federal court. *Snowden v. Singletary*, 135 F.3d 732, 736 (11th Cir. 1998) ("[W]hen

it is obvious that the unexhausted claims would be procedurally barred in state court

due to a state-law procedural default, we can forego the needless 'judicial ping-pong'

and just treat those claims now barred by state law as no basis for federal habeas

relief.").

Because Shrader fails to demonstrate either cause and prejudice or a

miscarriage of justice based on actual innocence, the claim is procedurally barred in

federal court. (Doc. 9 at 7–8) *Maples*, 565 U.S. at 280; *House*, 547 U.S. at 536–37.[4]

Even if Shrader fairly presented a federal claim, the claim is meritless. The

state appellate court affirmed the trial judge's denial of the motion for a judgment of

acquittal as follows (Doc. 8-1 at 1285–94):

> "In reviewing a motion for judgment of acquittal,
> a *de novo* standard of review applies." *Starks v. State*, 223
> So. 3d 1045, 1048 (Fla. 2d DCA 2017) (quoting *Pagan v.
> State*, 830 So. 2d 792, 803 (Fla. 2002)).[5] "Generally,
> a motion for judgment of acquittal should be denied '[i]f,
> after viewing the evidence in the light most favorable to the
> State, a rational trier of fact could find the existence of the
> elements of the crime beyond a reasonable doubt.'"
> *Westbrooks v. State*, 145 So. 3d 874, 877 (Fla. 2d DCA 2014)
> (alteration in original) (quoting *Pagan*, 830 So. 2d at 803);
> *see also Lynch v. State*, 293 So. 2d 44, 45 (Fla. 1974) ("The
> courts should not grant a motion for judgment of acquittal
> unless the evidence is such that no view which the jury may
> lawfully take of it favorable to the opposite party can be

---

[4] Shrader contends that he fairly presented a federal claim by asserting in his ineffective
assistance of appellate counsel petition that appellate counsel deficiently performed by
not federalizing the sufficiency of the evidence claim. (Doc. 9 at 7–8) The Court
addresses that claim in Ground Two.

sustained under the law." (emphasis added)). As our supreme court has explained:

> Where there is room for a difference of opinion between reasonable men as to the proof or facts from which an ultimate fact is sought to be established, or where there is room for such differences as to the inferences which might be drawn from conceded facts, the court should submit the case to the jury for their finding, as it is their conclusion, in such cases, that should prevail and not primarily the views of the judge.

*Lynch*, 293 So. 2d at 45.[6]

> [5] The dissent suggests that the panel opinion properly employed a *de novo* review of Shrader's motion for judgment of acquittal in its panel decision. Although we agree that the panel opinion stated that it was conducting a *de novo* review of the denial of the motion for judgment of acquittal, it conducted anything but a proper review. The panel opinion failed to explain that our *de novo* review must yield an affirmance of a conviction if it is supported by competent, substantial evidence. *See Boyd v. State*, 910 So. 2d 167, 180 (Fla. 2005) ("We assess a trial court's ruling on a motion for judgment of acquittal on a *de novo* standard of review and affirm the conviction if it is supported by competent, substantial evidence.").

> [6] The panel opinion also improperly set forth the evidence in the light most favorable to Shrader, not the State, contrary to settled case law. *See Pagan*, 830 So. 2d at 803; *Lynch*, 293 So. 2d at 45; *Starks*, 223 So. 3d at 1049. Instead of drawing all inferences in favor of the State, the panel opinion attempted to provide contrived examples as to how the evidence "could have" boded in favor of

Shrader's attorney's argument in support of the motion for judgment of acquittal; namely, that the victim consented to sex with him prior to her being killed. We note that Shrader's attorney's argument in support of the motion for judgment of acquittal is inconsistent with Shrader's prior statements that he neither knew the victim nor had visited Whiskey Stump. Shrader seemed to change his version of events after he learned that the investigating officers had DNA evidence connecting him to the victim and Whiskey Stump. This is but one of Shrader's many telling and retellings of his version of events. Be that as it may, the panel opinion posited that the "sexual activity between them could have occurred well before the infliction of the fatal injuries, and there is no medical evidence to suggest that the victim suffered any sexual trauma." 41 Fla. L. Weekly at D2082. It further dismissed evidence of "Shrader's apparent evasions about his whereabouts and not remembering the victim" as evidence of his commissions of the alleged sexual batteries. *Id.* Again, the panel opinion theorized, with no evidentiary support, that "Mr. Shrader may have chosen to give evasive answers to the investigators' questions about such topics whether or not he had committed the alleged sexual batteries." *Id.* at D2082–83 (emphasis added). The panel opinion went on to dismiss the fact that the victim's slain body was discovered naked from the waist down by theorizing that "the killer or killers could have removed her clothing after the stabbing for a variety of reasons." *Id.* at D2083. These are not views of the evidence in the light most favorable to the State.

As an initial matter, Shrader has maintained throughout this appeal that the special circumstantial evidence standard applies, even in light of our supreme court's

*Knight* decision. Our supreme court has described the circumstantial evidence standard as follows: "Where the only proof of guilt is circumstantial, no matter how strongly the evidence may suggest guilt[,] a conviction cannot be sustained unless the evidence is inconsistent with any reasonable hypothesis of innocence." *Knight*, 186 So. 3d at 1009 (alteration in original) (quoting *Jaramillo v. State*, 417 So. 2d 257, 257 (Fla. 1982)). In *Knight*, the supreme court

> expressly [held] that the circumstantial evidence standard of review applies only where all of the evidence of a defendant's guilt — *i.e.*, the evidence tending to show that the defendant committed or participated in the crime — is circumstantial, not where any particular element of a crime is demonstrated exclusively by circumstantial evidence.

*Id.* at 1010 (emphasis added).

Firmly grounded in his position that the special circumstantial evidence standard applies, Shrader argues that because the State neglected to present sufficient evidence inconsistent with what he contends is a reasonable hypothesis of innocence, the jury's convictions for the two sexual battery charges and the felony murder charge predicated upon those sexual battery charges must be reversed. Specifically, he maintains that the State did not produce sufficient evidence inconsistent with his reasonable hypothesis of innocence that the sexual acts upon the victim were consensual and that the killing occurred sometime later. We reject his argument.

First, we note that *Knight* clarified that the general judgment of acquittal standard, not the special circumstantial evidence standard, applies where there is evidence tending to show that the defendant committed or participated in the crime. Here, the State did not present wholly circumstantial evidence supporting Shrader's guilt for sexual battery with a deadly weapon or actual physical force likely to cause serious personal injury. Under the facts of this case, Shrader's DNA found inside the victim

is direct evidence of Shrader's participation in the crime of sexual battery. Indeed, this is so because Shrader denied even knowing the victim, let alone having sexual contact with her. *See* § 794.011(1)(i) and (3), Fla. Stat.; Fla. Std. Jur. Instr. (Crim.) 11.2, Sexual Battery. Specifically, during Detective Fox and Special Agent Noblitt's interviews with Shrader, Shrader denied ever knowing the victim and denied ever having been to Whiskey Stump. This physical evidence is direct evidence that Shrader, at a minimum, had sexual contact with the victim, whose slain body was found at Whiskey Stump near droplets of Shrader's blood leading away from the victim's body. *Cf. Lightbourne v. State*, 438 So. 2d 380, 391 (Fla. 1983) (determining that "[v]iable sperm and semen traces . . . discovered in the victim's vagina indicat[ed] sexual relations at approximately the time of death" and therefore supported a finding of sexual battery); *Burkell v. State*, 992 So. 2d 848, 854 (Fla. 4th DCA 2008) ("Footprints and blood-DNA may operate as direct evidence for some specific issues. For example, footprints may directly establish a person was at a certain place in spite of denying ever being there. Blood-DNA analysis may settle the identity of the one contributing a specimen.").[7] Stated another way, Shrader's semen-DNA is direct evidence that he had sexual contact with the victim, and his blood-DNA evidence found near her deceased body is direct evidence that he was present at Whiskey Stump.[8]

> [7] In cases where the defendant did not dispute knowing the victim, unlike Shrader here, DNA evidence has been categorized as circumstantial evidence of guilt of a sexual battery. *See, e.g.*, *Caylor v. State*, 78 So. 3d 482, 494 (Fla. 2011) (treating semen matching defendant's DNA that was recovered from inside deceased victim as circumstantial evidence of sexual battery where defendant did not dispute sexual encounter); *Thomas v. State*, 894 So. 2d 126, 133 (Fla. 2004) (same).

> [8] Although we set forth the general judgment of acquittal standard in the main text of this opinion, we have set forth detailed facts in

this opinion to also support affirming the trial court's denial of Shrader's motion for judgment of acquittal under the special circumstantial evidence standard. That is, even assuming for the sake of argument that the special circumstantial evidence applies, the trial court's denial of Shrader's motion for judgment of acquittal yielded no reversible error because the State presented competent evidence inconsistent with Shrader's versions of events. *See McWatters v. State*, 36 So. 3d 613, 633 (Fla. 2010). Indeed, we agree with the dissent that the special circumstantial evidence does not apply here. After careful review of trial evidence viewed in the light most favorable to the State, we have no pause concluding that the State presented competent evidence to rebut Shrader's hypothesis of innocence that he had consensual sex with the victim prior to her death.

A law enforcement officer discovered the victim's "warm" body on the "extremely, extremely bitterly cold" morning of January 27, 1986, in an area called Whiskey Stump. The victim was lying in the middle of a dirt road, in full view of any passerby, surrounded by blood spatters. She had been stabbed thirty-six times, was without the clothes she was wearing earlier that night, and was wearing only a yellow T-shirt. The assistant medical examiner who analyzed the victim's body opined that the victim was probably killed where her body was found. It is undisputed that semen containing Shrader's DNA was found inside of the victim's vagina and anus. It is likewise undisputed that blood found in the soil at the scene of the murder matched Shrader's DNA and that Shrader had cuts on his right hand later that morning which prevented him from giving fingerprints. The State presented testimony from an investigating officer that prior to being confronted with DNA evidence that he had sex with the victim, Shrader not only denied that he and the victim had any sexual contact but completely denied ever having met the victim or otherwise knowing who she was. Clearly, the DNA

evidence left behind in his blood and semen contradicts that version of events.

Shrader's inconsistencies do not stop there. One of Shrader's then-roommates testified at trial that on the night of the murder Shrader came home with a bleeding hand. Shrader gave no fewer than three inconsistent accounts of how he cut his hand on the night of the murder. The roommate testified that Shrader first told her he had cut his fingers on a nail sticking up from a banister outside of their apartment. On the morning after the murder, Shrader appeared in a courthouse in Hillsborough County for reasons unrelated to the murder in this case. Shrader was unable to have his right hand fingerprinted due to cuts on his pinky, ring finger, and middle finger. Later that same day, when Shrader went to have his fingers sutured at Tampa General Hospital, he informed his attending doctor that he had cut his hand while working as a roofer. After the case was re-opened leading to this conviction, Shrader was interviewed by two officers from the Florida Department of Law Enforcement. In the course of the interview, Shrader told the officers that he cut his hand on a knife while reaching into a dishwasher. Shrader's then-roommate contradicted Shrader's account by testifying that Shrader never washed the dishes while they were roommates and that they did not even own a dishwasher. Indeed, whether Shrader's multiple evasions revealed a consciousness of guilt was for the jury to determine. *See Straight v. State*, 397 So. 2d 903, 908 (Fla. 1981) ("When a suspected person in any manner attempts to escape or evade a threatened prosecution by flight, concealment, resistance to lawful arrest, or other indications after the fact of a desire to evade prosecution, such fact is admissible, being relevant to the consciousness of guilt which may be inferred . . . ." [ ]).

Taken together, the evidence more than supports the trial court's denial of Shrader's motion for judgments of acquittal. *See McWatters v. State*, 36 So. 3d 613, 634 (Fla. 2010) (holding that a jury could have reasonably inferred that a murder victim did not consent to sex with defendant where disturbed dirt was found surrounding her dead body and where she had damaged undergarments; also holding

that a jury could have reasonably inferred that another of the defendant's murder victims did not consent to sex with defendant where her body was found nude from the waist down, her shirt and bathing suit top were pushed up into the armpit area, her sandals were found approximately twelve feet apart from one another, and her jeans were found stained with grass or dirt); *Williams v. State*, 967 So. 2d 735, 755–56 (Fla. 2007) (holding that a jury could have reasonably inferred lack of consent to sex where police discovered the victim completely nude, found her blood-stained shorts and panties under her bed, and found bite marks on her breast and back and in the general area of her groin); *Fitzpatrick v. State*, 900 So. 2d 495, 509 (Fla. 2005) (determining evidence was sufficient to support conviction of felony murder with sexual battery as the underlying felony where a victim who had her throat slit "was found naked with her bloody undergarment wrapped around her waist near her breasts" and had suffered from a mix of other physical injuries); *Taylor v. State*, 583 So. 2d 323, 329 (Fla. 1991) (holding that extensive physical injuries suffered by victim were inconsistent with defendant's hypothesis that he briefly had consensual vaginal sex with her followed by consensual oral sex), *declined to follow on other grounds by Brown v. State*, 755 So. 2d 616 (Fla. 2000); *cf. State v. Ortiz,* 766 So. 2d 1137, 1142–43 (Fla. 3d DCA 2000) (determining that a prima facie case for sexual battery had been established where "victim was found beaten and virtually nude in an isolated wooded area of a park with her shirt pulled up around her head and her shorts down around her ankles").

The trial court did not err in denying Shrader's motion for judgment of acquittal. Our system of justice is based on a jury making these factual determinations, not judges. This is especially true where, as here, the disputed issue involves consent, which our court has previously held falls squarely within the province of the jury to decide. *See State v. Hudson*, 397 So. 2d 426, 428 (Fla. 2d DCA 1981) ("Questions of consent, force, resistance and fear are particularly within the province of the jury to determine." [ ] (citing *Berezovsky v. State*, 335 So. 2d 592, 593 (Fla. 3d DCA 1976)), *rev'd in part on other grounds*, 350 So. 2d 80 (Fla. 1977))). Our court has explained that because mental

intent is seldom proved by direct evidence, "the absence of direct proof on the question of the defendant's mental intent should rarely, if ever, result in a judgment of acquittal." *Wallace v. State*, 764 So. 2d 758, 760 (Fla. 2d DCA 2000) (quoting *Ehrlich v. State*, 742 So. 2d 447, 450–51 (Fla. 4th DCA 1999)). The same logic applies to circumstantial evidence of a victim's consent to violent contact — particularly where the victim is unavailable to testify. *See State v. Clyatt*, 976 So. 2d 1182, 1184 (Fla. 5th DCA 2008) ("We see no distinction between the use of circumstantial evidence to prove state of mind in these contexts and the State's attempted use of circumstantial evidence to prove the victim's lack of consent in this battery case.").

Next, we reject the dissent's suggestion that lack of physical trauma to a victim's vagina or rectum implies that the victim necessarily consented to sexual activity. The assistant medical examiner testified that "there was no physical evidence of bruising, lacerations, or tearing in any of the orifices, such as the vagina or rectum." He then clarified:

> It doesn't mean that sexual battery didn't take place. It just meant that there was no physical evidence of bruising, lacerations, or tearing in any of the orifices, such as the vagina or rectum were left [*sic*]. And, of course, you have many people who are raped in which you don't see the evidence of this type of thing, but we didn't see that in this case.

[ ]

The victim here falls into the latter category — those who do not show evidence of sexual trauma. Viewing the medical examiner's testimony in the light most favorable to the State, the medical examiner's testimony shows nothing more than that the victim of sexual battery here, like "many" other victims of sexual batteries, was left without bruising, lacerations, or tearing of her orifices. Our court would necessarily need to weigh the medical examiner's testimony in favor of Shrader to conclude that

the sexual contact with the victim was consensual because it did not leave bruising, lacerations, or tearing of the victim's orifices. No court should weigh the evidence in such a manner when viewing the evidence in the light most favorable to the State or the jury's guilty verdict. *See Fitzpatrick*, 900 So. 2d at 508; *Bradford*, 460 So. 2d at 930 ("We are not allowed to retry a case or reweigh the conflicting evidence submitted to the jury."). The trial court followed the law and correctly denied Shrader's motion for judgment of acquittal. *Cf. McKee v. State*, 159 Fla. 794, 33 So. 2d 50, 52 (Fla. 1947) ("The trial court refused to disturb the finding of the jury, and for this court to do so would amount to a substitution of our judgment for that of the jury, in an area where we would be little, if any, short of judicial meddlers."); *Bradford*, 460 So. 2d at 930 ("We must limit our concern to whether, after all conflicts in the evidence and all reasonable inferences derived therefrom have been resolved in favor of the verdict, there is substantial, competent evidence to support the verdict and judgment.").

"[A] conviction based upon a record wholly devoid of any relevant evidence of a crucial element of the offense charged is constitutionally infirm." *Jackson v. Virginia*, 443 U.S. 307, 314 (1979). "[T]he relevant question is whether, after viewing the evidence in the light most favorable to the prosecution, *any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *Jackson*, 443 U.S. at 319 (italics in original). Under federal due process, a prosecutor does not have "an affirmative duty to rule out every hypothesis except that of guilt beyond a reasonable doubt." *Jackson*, 443 U.S. at 326.

Shrader asserts that the prosecutor failed to prove that he committed a sexual battery. (Doc. 1 at 3) He further asserts that, because the underlying felony for the

felony murder conviction was the sexual battery, the prosecutor also failed to prove that he committed felony murder. (Doc. 1 at 3)

At trial, Deputy Robert King testified that, on January 27, 1986, he responded to a call in the southern part of Hillsborough County about persons unlawfully camping on private property. (Doc. 8-1 at 309–12) When he arrived, he discovered the body of Sharon Moss. (Doc. 8-1 at 310, 319) The deputy observed stab wounds on Moss's body and steam rising from the wounds during the very cold morning. (Doc. 8-1 at 316, 319) The deputy observed large amounts of blood around Moss's body. (Doc. 8-1 at 322–25)

A medical examiner testified that he went to the scene and observed Moss's body lying on its right side in the middle of the road. (Doc. 8-1 at 387–88) Moss wore a T-shirt and no other clothes and suffered thirty-two stab wounds to the front, side, and back of her body and head. (Doc. 8-1 at 389, 392–94) Also, Moss suffered defensive-type wounds to her left arm and right hand. (Doc. 8-1 at 393–95) Some of the wounds were two to three inches deep. (Doc. 8-1 at 396–97) The medical examiner identified several wounds on Moss's chest and back that penetrated vital organs and would have by themselves caused Moss's death. (Doc. 8-1 at 397–400)

The medical examiner testified that he could not state definitively whether the stabbing occurred where the deputy found Moss's body. (Doc. 8-1 at 401) However, he opined that the stabbing likely occurred where the deputy found Moss's body because of the large amount of blood around her body. (Doc. 8-1 at 401) The medical examiner opined that the cause of death was multiple stab wounds and the manner

of death was homicide. (Doc. 8-1 at 404) The medical examiner further opined that

Moss was conscious when the wounds were inflicted. (Doc. 8-1 at 408)

The medical examiner collected from Moss's body oral, anal, and vaginal

swabs. (Doc. 8-1 at 405) The medical examiner testified that, even though he did not

observe any bruising, lacerations, or tearing in Moss's vagina and anus, a person who

is raped does not always suffer a physical injury. (Doc. 8-1 at 409)

Twenty-one years after the deputy found Moss's body, a homicide detective

re-opened the investigation of the case and submitted for DNA testing the oral, anal,

and vaginal swabs and soil samples that contained blood collected a few feet from

Moss's body. (Doc. 8-1 at 342–47, 427, 429–40) A forensic analyst extracted eleven

of fifteen locations in a DNA profile from the vaginal and anal swabs (Doc. 8-1 at

857–58), fourteen out of fifteen locations in a DNA profile from one soil sample

(Doc. 8-1 at 858–59), and fifteen out of fifteen locations in a DNA profile from a

second soil sample. (Doc. 8-1 at 859)

A DNA profile from Shrader matched all eleven locations identified in the

DNA profile from the vaginal and anal swabs, matched all fourteen locations

identified in the DNA profile from one soil sample, and matched all fifteen locations

identified in the DNA profile from the second soil sample. (Doc. 8-1 at 868–74)

On January 27, 1986, the same day when the deputy found Moss's body,

Shrader went to a county building for fingerprinting. (Doc. 8-1 at 580–81) An

employee at the county building was unable to obtain fingerprints from Shrader's

right hand because his right hand was injured. (Doc. 8-1 at 581–82) That morning,

Shrader told his brother's girlfriend that he injured his right hand on a nail on a banister. (Doc. 8-1 at 571–72) A short time later in February, a doctor who treated the injury observed that Shrader had cuts on his ring finger and little finger on his right hand. (Doc. 8-1 at 597) Shrader told the doctor that he cut his hand while working as a roofer. (Doc. 8-1 at 597) In 2011, during an interview with a detective on the telephone, Shrader said that he had cut fingers on his right hand on a knife while washing dishes at home. (Doc. 8-1 at 714, 716, 718) Shrader lived with his brother and his brother's girlfriend, and his brother's girlfriend testified that Shrader never washed the dishes. (Doc. 8-1 at 572–73)

In January of 2011, a detective showed Shrader a picture of Moss, told Shrader her name, told him that she was murdered, and asked if he knew her. (Doc. 8-1 at 626–28) Shrader denied that he had ever seen her. (Doc. 8-1 at 629, 633) Shrader told the detective that he used to drink alcohol in excess, did not remember a person's name well, and only remembered a person's face. (Doc. 8-1 at 633–34)

About two or three weeks later, during a telephone call, Shrader told the detective that he still did not remember anything. (Doc. 8-1 at 704, 717, 719–21) Shrader denied that he had ever visited the area where the deputy found Moss's body. (Doc. 8-1 at 706) Shrader stated that Moss did not look familiar to him and that he did not know her. (Doc. 8-1 at 707, 709, 716–18)

Viewed in the light most favorable to the prosecution, the evidence proved that Shrader sexually battered Moss. A DNA profile from Shrader matched all eleven locations identified in the DNA profile from the vaginal and anal swabs from Moss's

body. (Doc. 8-1 at 857–58, 868–69) The forensic analyst testified that the probability that the DNA profile matched another person was one in 5.2 quadrillion in the Caucasian population. (Doc. 8-1 at 873) This unrefuted DNA evidence proved that Shrader engaged in vaginal and anal sex with Moss.

On the day that the deputy found Moss's body, Shrader suffered cuts on fingers on his right hand. (Doc. 8-1 at 571–72) Shrader told a detective that he had cut his fingers on a knife. (Doc. 8-1 at 714, 716, 718) Moss died after suffering thirty-two knife wounds to her body and head. (Doc. 8-1 at 389, 392–94) A DNA profile from drops of blood found near Moss's body matched Shrader's DNA profile. (Doc. 8-1 at 868–74) Viewed in the light most favorable to the prosecution, the evidence proved that Shrader was at the scene where the deputy found Moss's body, wielded a knife, stabbed Moss with the knife, and cut himself.

Even though no bruising, lacerations, or tearing appeared in Moss's vagina and anus, the medical examiner opined that a person who is raped does not always suffer a physical injury. (Doc. 8-1 at 409) The deputy found Moss in a secluded area. She had been stabbed over thirty times. She was surrounded by blood, wearing only a T-shirt, and no pants, underwear, or other clothes. (Doc. 8-1 at 389, 392–94) Viewing this evidence in the light most favorable to the prosecution, a rational juror could conclude that, while brandishing a knife and before killing her, Shrader engaged in vaginal and anal sex with Moss without her consent. *Coleman v. Johnson*, 566 U.S. 650, 655 (2012) ("*Jackson* leaves juries broad discretion in deciding what inferences to draw from the evidence presented at trial, requiring only that jurors

'draw reasonable inferences from basic facts to ultimate facts.'") (quoting *Jackson*, 443 U.S. at 319).

Shrader argues that the prosecutor failed to rebut a reasonable hypothesis of innocence that any sexual acts occurred consensually before the victim was killed. (Doc. 1 at 12) At the time of Shrader's trial, Florida law required a prosecutor to rebut a reasonable hypothesis of innocence if the evidence of a defendant's guilt was circumstantial. *Knight v. State*, 186 So. 3d 1005, 1009–10 (Fla. 2016).[5] However, under federal law, Florida's circumstantial evidence standard does not apply. *Preston v. Sec'y, Fla. Dep't Corrs.*, 785 F.3d 449, 463 (11th Cir. 2015) ("[T]he Florida rule and the federal rule are significantly different. Under *Jackson*, the prosecution does not have 'an affirmative duty to rule out every hypothesis except that of guilt beyond a reasonable doubt.'") (quoting *Jackson*, 443 U.S. at 326).

Also, Shrader told the detective that he had never visited the area where the deputy found Moss's body and denied knowing Moss. (Doc. 8-1 at 629, 633, 706–07, 709, 716–18) Because Shrader did not testify or present any evidence that he either knew Moss or engaged in consensual sex with her, the state appellate court reasonably rejected a hypothesis of innocence based on consensual sex. *State v. Campbell*, 157 So. 3d 346, 349 (Fla. 2d DCA 2015) ("'The State is not required to

---

[5] After Shrader's convictions and sentences were final, *Bush v. State*, 295 So. 3d 179, 200–01 (Fla. 2020), abandoned the circumstantial evidence standard and adopted the standard applied to a federal due process claim.

rebut a hypothesis of innocence that is unreasonable.'") (quoting *Westbrooks v. State*, 145 So. 3d 874, 878 (Fla. 2d DCA 2014)).

Lastly, *Williams v. State*, 967 So. 2d 735, 756–57 (Fla. 2007), holds that a prosecutor sufficiently proves felony murder based on a sexual battery if a rational juror could conclude that both crimes occurred during the same criminal episode:

> In cases involving felony murder with sexual battery as the underlying felony, this Court has rejected claims by a defendant that "the murder did not occur 'during' the actual sexual battery" and has upheld a felony murder conviction where the murder of one victim and the subsequent kidnapping and sexual battery of another victim "were part of the same criminal episode." *Roberts v. State*, 510 So. 2d 885, 888 (Fla. 1987) (citing *Jefferson v. State*, 128 So. 2d 132, 137 (Fla. 1961) ("It is a homicide committed during the perpetration of a felony, if the homicide is part of the res gestae of the felony.")). We have further stated that "[n]either the passage of time nor separation in space from the felonious act to the killing precludes a felony murder conviction when it can be said . . . that the killing is a predictable result of the felonious transaction." *Stephens v. State*, 787 So. 2d 747, 757 (Fla. 2001) (quoting *Mills v. State*, 407 So. 2d 218, 221 (Fla. 3d DCA 1981)).

Because a rational juror could conclude that the sexual battery and the killing of the victim occurred as part of one prolonged attack, the evidence sufficiently proved felony murder. *Williams*, 967 So. 2d at 757. Consequently, the state appellate court did not unreasonably deny Shrader's federal due process claim.

In his reply, Shrader asserts that the state appellate court violated his federal right to procedural due process by *sua sponte* issuing the *en banc* opinion without notice or an opportunity to be heard. (Doc. 9 at 9–10) The argument, raised for the

first time on reply, is waived. *Herring v. Sec'y, Dep't Corrs.*, 397 F.3d 1338, 1342 (11th Cir. 2005). Also, the docket of the case on direct appeal demonstrates that the state appellate court directed the parties to submit supplemental briefs before vacating the panel opinion and issuing the *en banc* opinion. (Doc. 8-1 at 1175–78) Also, Shrader filed a petition for review of the *en banc* opinion in the Florida Supreme Court. (Doc. 8-1 at 1459–73) Because the state appellate court provided Shrader with an opportunity to be heard both before and after the *en banc* opinion issued and because Shrader fails to demonstrate that the state appellate court deprived him of any right, the state court did not violate Shrader's federal right to procedural due process. *Club Madonna, Inc. v. City of Miami Beach*, 924 F.3d 1370, 1378 (11th Cir. 2019).

Ground One, Subclaim B is **DENIED**.

**Ground Two**

Shrader further asserts that appellate counsel deficiently performed by failing to federalize the sufficiency of the evidence claim on direct appeal. (Doc. 1 at 13–14) The state appellate court denied the claim in a decision without a written opinion. (Doc. 8-1 at 1511) Shrader must demonstrate that there is no reasonable basis for the denial of the claim. *Harrington*, 562 U.S. at 98 ("Where a state court's decision is unaccompanied by an explanation, the habeas petitioner's burden still must be met by showing there was no reasonable basis for the state court to deny relief.").

In the brief on direct appeal, appellate counsel asserted that the trial judge erroneously denied the motion for judgment of acquittal because the prosecutor

failed to rebut Shrader's reasonable hypothesis of innocence. (Doc. 8-1 at 1211–14)
Appellate counsel did not argue that the trial judge violated federal due process, did
not cite any federal court opinion or constitutional provision, did not label the issue
"federal," and cited only state court opinions. (Doc. 8-1 at 1211–14) Consequently,
appellate counsel failed to fairly present a federal claim. *Kelley*, 377 F.3d at 1345.

However, for the reasons explained above, a federal due process claim would
not have succeeded on direct appeal. Because Shrader fails to demonstrate both
deficient performance and prejudice under *Strickland*, the state appellate court did not
unreasonably deny the ineffective assistance of appellate counsel claim. *Strickland*,
466 U.S. at 694. *Pinkney v. Sec'y, Dep't Corrs.*, 876 F.3d 1290, 1297 (11th Cir. 2017)
("[A]n attorney will not be held to have performed deficiently for failing to perform
a futile act, one that would not have gotten his client any relief.").

Ground Two is **DENIED**.

**Ground Three**

Shrader asserts that trial counsel deficiently performed by failing to object to
comments by the prosecutor during closing argument. (Doc. 1 at 15–17) The
post-conviction court denied the claim as follows (Doc. 8-1 at 1623–27) (state court
record citations omitted):

> Defendant alleges ineffective assistance of counsel due to
> his counsel Mr. Fraser's failure to object to the State's
> comments during closing argument alluding to facts not in
> evidence and facts which could not be reasonably inferred
> from the evidence. He alleges that had his counsel objected
> to these improper comments and either sought a curative
> instruction or moved for a mistrial, there is a reasonable

probability that the jury would have found him not guilty or guilty of a lesser offense. He, relying on pages 940 and 941 of the trial transcript, alleges that during closing arguments, the prosecutor claimed, without objection, the following:

[Prosecutor:]    Sharon Moss was found unclothed except for the T-shirt that was pulled up around her neck. She was found without any clothes. Her clothes were not found there because the murder happened contemporaneously with the rape. This girl didn't even have a chance to put her panties back on. There was the rape and the murder occurring at the same time. There was no separation in time.

However, Defendant alleges that these facts were absolutely wrong and contrary to the evidence.

Defendant alleges that according to the State's own evidence, the latter detail was incorrect. He alleges that it is true that one of the crime scene photographs depicted the victim on her back with her T-shirt pulled above her breast. He, relying on pages 297 through 303 of the trial transcript, alleges that according to the other photographs taken that day, as well as the testimony of the deputy who discovered the body, the victim was not on her back when she was found. He alleges that she laid on her side with her face and chest turned down toward the ground. He alleges that as depicted in the crime scene photographs, when the victim was found, the tail of her T-shirt had crept up a few inches from her waist, but the shirt otherwise fully covered her torso. He further alleges that the shirt bore holes where it had been penetrated by the assailant's weapon because the victim was stabbed through her shirt. He alleges that the shirt could not have been pulled up around her neck during the attack, and contrary to the prosecutor's assertion in closing argument, it was not found that way. He alleges that during the crime scene investigation, the victim was rolled onto her back, and her shirt was pulled up, so that the wounds to her chest could be photographed.

Defendant maintains that his counsel should have objected and either sought a curative instruction or moved for a mistrial. He alleges that had his counsel objected and prohibited the jury from hearing this false evidence, there is a reasonable probability that the jury would have found Defendant not guilty. He alleges counsel's unprofessional error in failing to object to this false, misleading evidence led the jury to believe evidence that was not proven or supported by the evidence. He alleges that counsel's failure to object left this error unpreserved for appellate review on direct appeal.

In its prior order the Court found that "failure to preserve issues for appeal does not show the necessary prejudice under *Strickland*." *Strobridge v. State*, 1 So. 3d 1240, 1242 (Fla. 4th DCA 2009). However, the Court found that because he alleges that had his counsel objected and prohibited the jury from hearing this false evidence, there is a reasonable probability that the jury would have found Defendant not guilty, Defendant's allegations were facially sufficient. The Court further found that it was unable to conclusively refute the allegations from the record and ordered the State to respond to this claim.

In its response, the State asserts that the comment in question does not remotely rise to a level that would justify a mistrial. The State, relying on *Spencer v. State*, 645 So. 2d 377, 383 (Fla. 1994), and *Ford v. State*, 802 So. 2d 1121 (Fla. 2001), asserts that a mistrial is only appropriate where a statement is so prejudicial that it vitiates the entire trial. The State asserts that a statement in closing argument that arguably mischaracterizes the state of the victim's undress at the time her body was found would not have merited a mistrial.

The State further asserts that in light of the overwhelming evidence of Defendant's guilt, the alleged mischaracterization of the evidence in closing argument is inconsequential. Specifically, the State relying on numerous pages of the trial transcript, asserts that at the trial, the State presented evidence which proved the following:

The victim, Sharon Moss, had been stabbed a total of thirty-two times to the front, side, and back of the torso;

The autopsy was conducted by Dr. Charles Diggs. Dr. Diggs opined that the cause of death was multiple stab wounds with perforations of both lungs and the heart;

Investigators observed apparent blood drops in proximity to Ms. Moss's body which they believed could have been deposited due to some injury to the perpetrator;

Evidence was presented which indicated that it was not unusual for an individual who inflicts multiple stab wounds to suffer some injury to himself as a result;

Samples of the soil in which these apparent blood drops were deposited were collected by crime scene investigator Linda Watts;

The apparent blood in these soil samples was a DNA match for Defendant;

The very morning the victim's body was discovered, Defendant was observed to have a significant cut on his right hand;

Defendant provided various conflicting accounts of how the injury occurred;

When Defendant was fingerprinted on an unrelated matter on the morning the victim's body was discovered, the individual that was processing Defendant was unable to obtain fingerprints from Defendant's right hand. The print form reflected that there was an injury to that hand;

Per witness Terry Albritton, the then-girlfriend of Defendant's brother, Defendant stated that he cut his hand on an exposed nail;

Defendant received treatment from a doctor in February of 1986 for those injuries to his right hand and explained that he received the injuries during employment as a roofer;

When discussing the injury to his hand with investigators in 2011, Defendant stated that he cut his hand washing dishes the night before;

Per witness Albritton, with whom Defendant resided with in January of 1986, Defendant never washed dishes;

Defendant's brother, David Bailey, confirmed that Defendant was right-handed;

Defendant's DNA was a match for the sperm fraction from a vaginal swab collected from the deceased victim; and

Defendant's DNA was also matched to the sperm fraction from an anal swab collected from the deceased victim.

The State asserts that based on the record of the trial in this case and the evidence of Defendant's guilt presented at the trial, there is no reasonable likelihood that Defendant would have obtained an acquittal or a mistrial based on the complained of statement in closing arguments. The State requests that the court deny the motion.

After reviewing the allegations, the State's response, the court file, and the record, the court finds the State's response persuasive. The court finds that there was overwhelming evidence of Defendant's guilt presented at trial, including apparent blood in the soil samples that were a DNA match for Defendant, the cut on Defendant's hand on the morning the victim's body was discovered,

Defendant's DNA matched the sperm fraction from a vaginal swab collected from the deceased victim, and Defendant's DNA matched the sperm fraction from an anal swab collected from the deceased victim. Consequently, the court finds Defendant cannot prove prejudice because even if Mr. Fraser made the alleged objection, requested a curative instruction, or made a motion for mistrial, and the court sustained the objection and granted the request for a curative instruction, it would not have changed the outcome of the trial based on the overwhelming evidence presented at trial. The court further finds that even if Mr. Fraser had made the alleged motion for mistrial, the court would have denied the motion for mistrial as the State's alleged comment during closing argument did rise to the level of warranting a mistrial. As such, no relief is warranted on the allegations in Defendant's motion.

During closing argument, the prosecutor told the jury (Doc. 8-1 at 967–68):

> [Prosecutor:]     Now, let's talk about elements three and four [of sexual battery] together. Three, a deadly weapon or force likely to cause serious personal injury was used; and four, the act was done without Sharon Moss's consent.
>
> Now, there's clearly no question that a deadly weapon was used, and I think that you can safely infer from the evidence that that deadly weapon was some type of knife, and I would submit to you that when viewed in light of the fact of the way that the victim was found here, that it proves a lack of consent.
>
> Sharon Moss was found unclothed except for the T-shirt that was pulled up around her neck. She was found without any clothes. Her clothes were not found there because the murder happened contemporaneously with the

> rape. This girl didn't even have a chance to put her panties back on. There was the rape and the murder occurring at the same time. There was no separation in time.

"Prosecutors have wide latitude in closing argument 'to review the evidence and to explicate those inferences which may reasonably be drawn from the evidence.'" *Johnson v. State*, 238 So. 3d 726, 739 (Fla. 2018) (citation omitted). However, "[p]rosecutors are limited in closing argument by the rules of professional conduct [which prohibit] 'intentionally . . . misstat[ing] the evidence or mislead[ing] the jury as to the inferences it may draw.'" *Johnson*, 238 So. 3d at 739 (citation omitted). "A trial court should grant a mistrial only when the error is so prejudicial that it vitiates the whole trial." *Loyd v. State*, 379 So. 3d 1080, 1091–92 (Fla. 2023). "This occurs when a prosecutor's comments 'deprive the defendant of a fair and impartial trial, materially contribute to the [verdict], [are] so harmful or fundamentally tainted as to require a new trial, or [are] so inflammatory that they might have influenced the jury to reach a more severe verdict than that it would have otherwise.'" *Loyd*, 379 So. 3d at 1092 (citation omitted).

At trial, the prosecutor introduced into evidence photographs of Moss's body taken by a crime scene investigator. (Doc. 8-1 at 315–16) The deputy who found Moss's body testified that the photographs depicted Moss's body in the same condition as when he found the body. (Doc. 8-1 at 316)

With the assistance of the photographs, the deputy described Moss's body as follows (Doc. 8-1 at 321–23):

[Prosecutor:]    Sergeant, I'm going to show you what has been marked — been entered into evidence as State's Exhibit A4. Can you tell us what we're looking at here, Sergeant?

[Deputy:]    This is the victim as I found her in the middle of the road.

[Prosecutor:]    And can you describe from looking at this photograph how you approached the victim's body?

[Deputy:]    I stepped in here to a certain point right before the blood, and I leaned down and put my hand into her neck area and tried to find a pulse.

[Prosecutor:]    Now, there's obviously some blood pooled around the body. Did you observe what appeared to be any other drops of blood outside of the immediate proximity of the victim's body?

[Deputy:]    At the time I didn't do that. There was blood everywhere. It was all over. All I did was I made sure when I stepped, I did not step in what I thought would be evidence, blood or anything else. I tried to step where there wasn't any. So, I had to look —

. . .

[Prosecutor:]    Okay. I'm going to show you what has been entered into evidence as State's Exhibit A6. And can you describe what we're seeing in this photograph?

[Deputy:]    This is — so that would be west, east. This would be the north side of the

46

| | |
|---|---|
| | roadway, looking back from behind her. |
| [Prosecutor:] | Now — |
| [Deputy:] | This would be the area where I was standing further this way, and then I walked over and checked her. |
| [Prosecutor:] | Now, as we see some blood at the bottom of this picture — |
| [Deputy:] | Uh-huh. |
| [Prosecutor:] | — toward the rear of the victim — |
| [Deputy:] | Yes, sir. |
| [Prosecutor:] | — was that blood — is that blood depicted as it appeared when you approached the body? |
| [Deputy:] | Yes, sir. |
| [Prosecutor:] | And State's Exhibit A8, can you describe what we see in this photograph, please? |
| [Deputy:] | This would be her legs. She's bent over. So, this is pretty close to her, and it's looking down, right up almost above her, I would think. I didn't take this picture, so I'm not sure. |

The medical examiner testified that he visited the crime scene the morning when the deputy found Moss's body. (Doc. 8-1 at 385) With the assistance of a report and the photographs, the medical examiner testified about his observations of the Moss's body as follows (Doc. 8-1 at 386–87):

47

[Prosecutor:]    Could you describe [ ] the scene because then I'm going to ask you to describe your initial observations once you arrived at the scene. Where was the body found and then take us to the position of the body and what have you.

[Examiner:]    Well, I would have to refer to the — because I just don't have any independent recollection.

[Prosecutor:]    Referring to the autopsy, would that also — would that, specifically as to [the] forensic investigation section of the report, would that tell you the location of the body and what have you.

[Examiner:]    Yeah, well, there was — yeah, the scene investigation, yeah, I can refer to that, and that will — that will tell me. First of all, we found a Caucasian female in her late twenties [ ] lying on her right side.

[Prosecutor:]    Is that also confirmed by the photographs that you have for your benefit, also, sir?

[Examiner:]    Yes, it's consistent with the photographs that's been provided to me, yes.

[Prosecutor:]    All right. And what about the location of where the body was found?

[Examiner:]    Well, once again, the location was found out in the roadside in the first stages of decomposition, clothing and T-shirt, as a matter of fact, was lying in the middle of the road, and that's just

about all I can say about that right now.

[Prosecutor:]   Yeah. Do you recall regarding the place as indicated in the report, regarding the place of death, does that assist you in describing specifically regarding the location of that scene?

[Examiner:]   When you say "place of death" —

[Prosecutor:]   As indicated in the report itself.

[Examiner:]   The place of death, she's lying on the right side in the middle of the road. That is what the report itself said. Now, the reason why I ask that question, I'm not concluding that —

[Prosecutor:]   Correct.

[Examiner:]   — you know, she was killed there.

. . .

[Prosecutor:]   You've described the victim as a white female in her twenties or early twenties or what have you.

[Examiner:]   Yes.

[Prosecutor:]   Could you further describe what, if anything, that she was wearing?

[Examiner:]   Yes. Once again, according to the documents and the photos, she was wearing a T-shirt.

[Prosecutor:]   Anything else?

[Examiner:]   That's pretty much — that's pretty much what we see here.

The testimony by the deputy and by the medical examiner demonstrates that the prosecutor accurately stated during closing that Moss "was found unclothed except for the T-shirt." (Doc. 8-1 at 967) However, the prosecutor inaccurately described the T-shirt as "pulled up around [Moss's] neck." (Doc. 8-1 at 967)

If trial counsel had objected to the comment for misstating the evidence, the trial judge would have sustained the objection. *Johnson*, 238 So. 3d at 739. However, Shrader cannot demonstrate a reasonable probability that the outcome at trial would have changed if trial counsel had successfully objected. *Strickland*, 466 U.S. at 649.

Even though the prosecutor mischaracterized the evidence by describing Moss's T-shirt as "pulled up around her neck," the jury saw during trial the photographs of Moss. The photographs depicted Moss's body in the same condition as when the deputy found the body. (Doc. 8-1 at 316) The jurors could observe themselves how the T-shirt appeared on Moss when the deputy discovered her body. Also, the prosecutor did not argue that Shrader strangled Moss with the T-shirt. The prosecutor argued that the jury could reasonably infer from the lack of clothing on Moss that she did not consent to sex with Shrader and that the sexual battery and the killing occurred during the same criminal episode.

Before jury selection, opening statements, and closing argument, the trial judge instructed the jury that argument by an attorney is not evidence. (Doc. 8-1 at 38, 280, 958) During the final charge, the trial judge instructed the jury that "[the] case must be decided only upon the evidence that [the jury] [had] heard from the testimony of the witnesses and [had] seen in the form of the exhibits in evidence and

[the] instructions." (Doc. 8-1 at 1016) A reviewing court presumes that a juror follows the trial judge's instructions in a criminal case. *Samia v. United States*, 599 U.S. 635, 646 (2023).

Lastly, the prosecutor did not repeat his misstatement about Moss's T-shirt pulled around her neck. Unrebutted evidence at trial proved that DNA profiles from vaginal and anal swabs from Moss's body and from blood drops near Moss's body matched Shrader's DNA profile. Moss suffered thirty-two knife wounds. The morning of the murder, the girlfriend of Shrader's brother observed several cuts on Shrader's fingers. Shrader told a detective that he cut his fingers on a knife. This evidence was sufficient to support a jury verdict that Moss did not consent to sex with Shrader. Even if the trial judge had sustained an objection to the prosecutor's isolated comment about Moss's T-shirt, Shrader cannot demonstrate a reasonable probability that the trial judge would have granted a motion for mistrial, instead of giving the jury a curative instruction, or that the outcome at trial would have changed. *Strickland*, 466 U.S. at 694. *Johnson v. Alabama*, 256 F.3d 1156, 1185 (11th Cir. 2001); *Duren v. Hopper*, 161 F.3d 655, 663 (11th Cir. 1998).

Ground Three is **DENIED**.

Accordingly, Shrader's petition (Doc. 1) is **DENIED**. The Clerk is **DIRECTED** to enter a judgment against Shrader and **CLOSE** this case.

## DENIAL OF CERTIFICATE OF APPEALABILITY AND
## LEAVE TO PROCEED *IN FORMA PAUPERIS*

Because Shrader neither makes a substantial showing of the denial of a constitutional right nor demonstrates that reasonable jurists would find debatable both the merits of the underlying claims and the procedural issues that he seeks to raise, a certificate of appealability and leave to appeal *in forma pauperis* are **DENIED**. 28 U.S.C. § 2253(c)(2). *Slack v. McDaniel*, 529 U.S. 473, 478 (2000).

**DONE AND ORDERED** in Tampa, Florida on August 26, 2025.

_____
MARY S. SCRIVEN
UNITED STATES DISTRICT JUDGE